Case number 251759 Hello Farms Licensing MI LLC v. GR Vending MI LLC et al. Argument not to exceed 15 minutes per side. Ms. Kostancic, you may proceed for the appellant. Thank you and may it please the court. Cannabis in the United States is federally illegal, period. It was in 2020 when the supply contract between the parties here was signed and it remains so today. It is a basic contractual principle that a federal court cannot order damages for the breach of a contract that was intrinsically illegal at the time that it was signed. This court's case law, Supreme Court case law, and treatises alike all say the same thing. A contract where the agreement itself was criminal is void and one party to that contract cannot use federal courts to enforce that agreement. That should have been the end of the inquiry in the district court. The district court instead found that this contract was consistent with public policy in light of the Rohrbacher-Farr appropriations riders. This was wrong both factually and legally. So let me start first with the law. The court said it in Triveno and I'll repeat it again here today. The Rohrbacher-Farr appropriations riders do nothing more than temporarily deny funding for the prosecution of medical marijuana crimes. This is not a medical marijuana contract. Does your argument depend on the medical versus recreational characterization of the contract? It doesn't. Can you win if we said oh it is medical? Yes, certainly your honor. But I do think it makes it a lot easier for this case that it was recreational. So Rohrbacher-Farr as this court said in Triveno does nothing more, this language I just quoted from the case, does nothing more than temporarily halt funding. It doesn't make the conduct that was the object of this conspiracy legal. So that alone, that's true of medical and recreational alike. On the facts, as your question notes, it's all the more easy here because the district court simply got it wrong by characterizing the party's agreement here as a medical marijuana contract. It was not. So the most obvious indication of that is that the contract imposed recreational testing standards only upon Hallow Farms. That makes zero sense if this was a medical marijuana. Was there any difference in the standards? Yes, your honor. There was a difference in the standards. So the medical testing requirements under Michigan law were about 10 times higher than recreational testing standards. And the contract here only required Hallow Farms to meet those recreational testing standards. It reflects that the contract at the time of its outside the four corners of the contract. And I would just note that the law is, I think, clear that this court's analysis should be limited to the four corners of the contract. But even if you go beyond that, you'll see that Hallow Farms then expanded by getting recreational licenses. So I believe that they had four medical licenses in 2020. They then obtained six recreational licenses in 2021. They dramatically expanded their harvest. And so this isn't just about mitigation as they say. It's actually that they were allowed to plant exponentially more crop than they did in 2020 using those recreational licenses. And it indicates that not just on the four corners of the contract, which your analysis should be focused on, but actually in practice, this was a contract for recreational marijuana. At the very least, even if... But at the time they signed the contract, they only had a medical license. That is true. Did that affect what they could do downstream or what downstream people would do with it? I don't think so. Not under Michigan laws. What's the difference between for a grower, a medical and a recreational license? So I think for a grower makes not a lot of difference as I understand it, except for testing that needs to be done downstream. So if they want to sell it as medical, microbial testing and the like is about 10 times higher. Under Michigan law, I don't know that it actually made a difference in this particular transaction because once it gets sold, it can be converted from medical to recreational and vice versa. So how would the contract have been written if it were a medical contract in your view? It would have subjected it to medical testing standards as opposed to what it explicitly did here, which is impose recreational testing standards. Where is that? Because all it says, it says passing local and state recreational cannabis testing. Is that what it is? Yes, your honor. Yes, exactly. But- So it required that there be, as your honor note, that it meet those recreational testing standards and not medical testing standards. So just on the four corners of the contract, it reflects that they contemplated that it would be recreational marijuana. So at the very least, I mean, even apart from the illegality analysis, which we urge this court to decide the case on, but even if you didn't accept that analysis, it would require appropriating the damages between the medical and the recreational side and keeping in mind that there was a dramatic expansion in 2021, meaning that the damages were largely driven by crop that was grown under these recreational licenses. So for every medical license, there were allowed to be 1,500 plants grown and there were four of those. And then when they expanded to recreational, there were six licenses and they got 2,000 plants per license. And so the majority of the 2021 crop was grown under recreational licenses. So at a very minimum, even putting aside the illegality, you would need to back out those damages. Why? I don't understand. The contract just said if you meet a certain THC level, you get 1,000 bucks or whatever. So I assume they just want to grow as much as they can, as potent as they can, and then you're going to buy it, right? Yes. And sorry to be unclear. I was talking about it from the perspective of illegality. So recreational marijuana, just like medical marijuana, remains federally illegal, even if you were to see a distinction between... I understand your argument is it's illegal. Even if you could get a medical safe harbor, even if it were Schedule 3, even if it was whatever, you're not going to get the benefit. You just have a straight illegal Schedule 1 problem. Okay, I get that. So you're saying the subsequent conduct with getting those four recreational licenses shows that the contract was recreational? But you had breached before they got those licenses, hadn't you? I don't know the exact timing. Isn't the exact timing all of the game on that point? No, because keeping in mind that there was, again, expansion in 2021. So even if there was a breach before those licenses would have obtained, they didn't continue just down the path of growing that same harvest. They expanded from seven acres to 25 acres after what they call the anticipatory breach. And so the question is what to do with all of that additional land where there was no evidence whatsoever of the THC content of that additional land. The district court, in speculative, that you could use the 2020 harvest THC potency. I want to go back to the illegality for a second before we get to that. Of course, yes. I want to ask about Jackson Purchase because I'm trying to figure out whether we need to apply those factors or not. What is your view on that? Yes. So I think that the Supreme Court case law, starting there, and it's responsive to your question about Jackson Purchase, but maybe if we could start with Kaiser Steel. I read Supreme Court case law, Continental Wall, Kaiser Steel, et cetera, to say that where you have an agreement that itself is illegal, not just the object of the conspiracy, not just involving illegal activities generally, but where the agreement itself is illegal, there's no balancing. So Continental Wall has this language in it about how you put the party's interests out of view when analyzing the enforceability of an illegal contract in that situation. Jackson Purchase applies these balancing factors, but only after it finds that the conduct there was not criminal. So the statute at issue in Jackson Purchase- Okay. So why isn't this situation analogous to Jackson Purchase in the sense that it is, okay, it's criminal. And in Jackson Purchase, it could have been a misdemeanor if it was willful, right? So it wasn't completely not criminal, but let's assume it's basically not criminal, right? But here it's criminal, but because of the Rohrabacher FAR, it's not going to carry any criminal penalties, right, realistically. So why, since I'm not going to be subject to the criminal penalties and it's illegal, why doesn't that just put it on par with the Jackson Purchase having two parts to the opinion? Before it goes into the restatement factors, it expressly analyzes whether it's criminal as a result of being willful. And it says, this is not criminal activity because it wasn't willful in that case. After it reaches that conclusion, which seems to assume that under cases like Kaiser Steel and Continental Wall, if there actually was a criminal conspiracy that was reflected by the agreement, you wouldn't get to those factors. But after holding that there was no willfulness, it then turns to the factors, it applies the balancing, keeping in mind that it ultimately does not enforce the contract even after applying those factors. But we think that that structure of that opinion is consistent with our argument that where you have an agreement that itself is illegal, that you never get to those balancing factors. I would urge the court, though, that if you do get to those balancing factors, to recognize that there's no fairness, unfairness inherent in this situation. Cannabis companies face a multitude of restrictions as a result of the federal illegality. So you're saying that every contract that your client has signed is illegal? I am saying that this supply contract in itself is illegal. Okay. Every supply contract that your client has signed is illegal. I think supply contracts just by their nature are federally illegal. And so they would be unenforceable under Kaiser. Courts have drawn distinctions across the nation between supply contracts, which I'm not aware of any court where there's been an illegality defense raised holding that a supply contract is enforceable in federal court. By contrast, there's been a number of cases in the context of employment or rental agreements or the like where courts have said, in that situation, we apply more of a balancing analysis to your honor's question about Jackson Purchase and have held those enforceable. And so this court doesn't need to reach that issue to decide this case before it. Thank you. Good afternoon. May it please the court. My name is Patrick Lannan. I represent the plaintiff at the Lee Hello Farms. I'm going to go right to medical and recreational distinction because apparently this case is now going back to the facts. Facts that we've lived for years and years and years. I'm going to quote Bobby Cerrone. He's the key witness for Curaleaf. His testimony, he was the deal architect. The trial record is replete in this respect. Hello Farms only had medical licenses and they certainly only had medical licenses well after the breach in question. I asked Mr. Cerrone the following, and you said Michigan has no restrictions on cultivations. Do you see that? Answer, uh-huh. Question, what does that mean? Answer, there was no license cap in the state of Michigan so they could issue as many cultivation licenses as they wanted under the regulations. What's the best case that you can collect on this? The best case that we can We did your honor. The best case, no problem. The best case with respect to the damages, including those damages that are recoverable as a result of the defendant's breach of the failure to purchase, that were grown under a recreational license, because this was a medical contract and I can prove it time and again, is that we had a reasonable duty to mitigate. When you are talking about mitigation, you're talking about mitigation. We have rules that apply to mitigation. When you are talking about illegality, you have illegality and rules that apply to illegality. What we hear from Curaleaf is that they want to transpose and bootstrap the illegality argument onto the damages question. We had to act commercially reasonably and we did so. And we, it is not as Curaleaf stopped doing business. They just kept buying recreational marijuana from other people whose prices were lower than ours, who are not subject to the contractual arrangement. What did Hello Farms do? It then went out and found a customer. It found a customer who was going to offer some but not as much money as Curaleaf. And here is, I think, a key quote on why Hello Farms obtained recreational licenses. Mr. Farah, the CEO of Hello Farms, who is in the courtroom today, testified that, as follows, and this is on cross-examination. He was asked, this is ECF247, page ID 1343940, below. As to licensing, very briefly, Mr. Farah, Hello Farms was originally a medical-only farm, right? Answer, yes, it was. Question, that changed for the 2021 harvest? Answer, yes, it did. Questions? You got some adult use? Can I ask you, can we go back to the contract? Because I am just curious. When you say it is medical, what are we, where is the length, what are you pointing? Yes, so the answer to that, and I will come back to my other point, is number one, the contract does not say anywhere. I have read it thousands of times. It doesn't say medicinal, it doesn't say recreational. Here is where you get there. And this, I think, gets to the court's, in my view, uncontroversial point, that when a contract doesn't discuss or address something, and here there is no integration clause, you look to extrinsic evidence. So the extrinsic evidence is one-sided here. We asked the witnesses, at trial. Well, what about this language that says you have to pass recreational cannabis testing requirements? Yes, I will address that directly, Judge. And CureLeaf answered, they, referring to the parties that used the pronoun they envisioned recreational, they is the key word there. They did not. CureLeaf did. I asked, and the reason is because CureLeaf, ironically, was going to use the cannabis for recreational. And here is the key quotes from that. Here are the other deal architects. Again, the contract doesn't say medicinal. So downstream, let's say you grow, they buy. Yes. They say, we're going to use it for recreational. We're going to sell it. They don't say that. Okay, but what I'm saying is, they don't say, we're only going to use it for medical, either. The contract doesn't seem to put any restriction on the buyer on what they can do once they buy the product from you. Correct. In the view, the test that Your Honor just announced is you look at the contract at the time in question. And here's how we know what the contract said. I asked, Mr. Ramos, who changes the product from medicinal to adult? He answers, I asked him, that was not going to happen on CureLeaf's watch. He answers, correct. Hollow Farms was selling you medicinal only. They were. Conroy, the other deal architect, testimony. And it was actually CureLeaf's plan. They don't tell us their plans. They don't tell us they're going to breach. They didn't tell us anything. There isn't a scintilla of evidence in this record that anyone will find that suggested somehow Hollow Farms knew CureLeaf's ultimate use. And even if there had been, I would submit CureLeaf was freely and contractually entitled to use the product in whatever ultimate form CureLeaf wanted. Poetically. I don't understand. If it's medicinal, what does that mean? It means that you pass the stricter testing requirements? Not exactly. I'll back up for a second to address that. Hollow Farms is a medicinal only farm. They grow product. It gets tagged with a yellow tag under Michigan medicinal statute. What CureLeaf does and what they conceded in the next quote that I... Hang on. Just go back. Explain it to me. Is there anything different about what comes out of the ground or how you process it that gets the yellow tag as opposed to a different tag? The product itself is not different. Whether you were allowed to grow it is different. So Hollow Farms is wearing a medicinal hat only. It signs a deal that says, we'll sell you what we have. It doesn't say rec or it doesn't say medicinal. It's very convenient that CureLeaf, the marijuana distributor says, well, the contract contemplated passing rec. Well, of course, because apparently, unbeknownst to us, and by the way, we passed for medicinal. This lowered one-tenth threshold. Whole Farm, 16,000 pounds, one try, all passed. We passed for medicinal, which is all that we were. So we gave them medicinal. They testified at trial, and I quote, it was your plan to convert it from medicinal to rec. Answer, yes. That was going to happen, and I quote, exclusively on CureLeaf's watch. This is undisputed. Pages 15 and 16 in my brief say exactly that. That's according to the trial record. So we have a contract. The contract itself doesn't say medicinal or rec. All it says is testing, but we weren't even allowed to sell rec. We weren't selling rec. We didn't have rec. We didn't grow rec. We couldn't grow rec. You weren't really allowed to sell medicinal either, were you? We were allowed to sell medicinal. How is that possible? The rescheduling just changed the scheduling of marijuana, right? Yes. Why did it have to do that? Oh, the federal government didn't have to. The acting attorney general's final order didn't have to do that. Congress has acted in the last decade and a half. These are... An appropriations writer is not rescinding the substantive criminal offense under the CSA. Do you agree with that? I do not agree with that. Okay. So our court has said, in Trevino, medical marijuana remains illegal under the Controlled Substances Act. You would say that we need to disregard what we've said on that before? Not in the least. Judge Larson wrote that opinion. She wrote that sentence. And then she very promptly, in the next breath, in a unanimous opinion, completed a full and robust analysis of whether or not the criminal defendant stayed within the outer limitations of the state medicinal requirements. And she assumed without deciding, right, that there is some sort of free-floating, equitable defense to criminal prosecution based on a lack of appropriated funds. She assumed that was the case. She assumed without deciding that the text of the appropriations writer applied to the criminal defendants. And then she said, nonetheless, we don't need to really resolve any of this because, like, you're so outside the bounds of state law. None of this really matters. The import of your Honor's questions is that, does this court hold that the appropriations writers have no effect? And that's not what the court said at all in Trevino. It said, let's assume they have effect. Because it wasn't, we don't issue advisory opinions. It wasn't of the utmost importance to resolve that, what I think is today, across the circuit, an uncontroversial, widely accepted rule. The DOJ is, Congress didn't just think about it overnight. They've done it 16 times in a row. These are passed by the House and the Senate and signed by the President. The DOJ can use, and I quote, the language from the statute itself, may not use any funds appropriated to take any action that would interfere with the implementation of the state law. And the predicate acts that follow in the direct object of the sentence, we have a subcommitted verb, direct object, include cultivation, supply, sales. The federal government has taken a position. Congress wasn't kidding. It wasn't bored on a Tuesday. It said, we want the states to decide this. And all the final order does is said, I see what. They've never amended the statute. I mean, if they don't pass the rider next year, you could get prosecuted for what you did four years ago, right? I disagree with that, Judge. I think. You would be immunized? How does it immunize you? At the time in question, we were allowed to do exactly what we did. This case is. I think that you were still violating the terms of the CSA. They just deprived funding to prosecute you for that to the executive branch. In the same way, there's like a non-enforcement priority issued. That doesn't mean that you aren't violating the CSA. And I think that's what McIntosh says in the footnote. I mean, McIntosh, kind of like the leading case on this from your position, says they could rescind the rider tomorrow and you'd be subject to prosecution. I would argue McIntosh is one of the original cases. The leading case today would be Bilodeau from the First Circuit, which added a materiality element to compliance with the state limitations. When a contract doesn't grow, when formed, it doesn't grow into illegality. Just like when a contract is illegal when formed, it doesn't grow into legal. What the acting attorney general says in his order, and it is quoted in my supplement, is that we are following the lead of Congress. We have found that the state statutes, that the laboratories of the democracy worked. In fact, forget just that they can continue to operate and the DOJ has continued to be defunded and can't interfere with this very significant state's rights issue, which properly belongs to the states. It's an important factor here. They went on to say it worked so well that he finds, the acting attorney general finds that it furthers the policy objectives that underlie the CSA of 1970. It has federal registration, stops the illicit markets, and two more critically important points about it. Number one, it adds a federal registration automatically, including the retroactive tax relief. So that, number one, demonstrates that it's not just today, it was a federal deference which immunized us. Today, it's a wholehearted federal assumption of that exact framework. Number two, is that the point of the doctrine, a dishonest, disfavored one that lies ill in the mouths of those who allege it, is to protect the public. This is a multi-billion dollar interstate cannabis empire selling recreational marijuana across the country under state statutes. We are far past the point where we're worried that this is going to harm the public or that we're going to protect the public. The ultimate underlying point, according to the U.S. Supreme Court, is that the doctrine is not here to absolve a litigant of his bad economic decision. It is only to protect the public. The illicit markets aren't at issue. Clearly, the defendant doesn't fear criminal prosecution, has walked into the United States Sixth Circuit Court of Appeals and said, we could go to prison for hundreds of years because we are dealing in the tens of thousands of pounds range of cannabis, medicinal and recreational. The reason this matters, counsel, is because without the formality of technically rescinding the criminal law, all we're trying to assess are vibes and the air about whether we think this is important or not to the federal government. And I take your position to be the RSA, the rider, gets us close enough to thinking there's a federal policy of decriminalization. But I mean, it's still illegal under the statute. So I'm a little worried about courts trying to assess the level of generality about drawing these public policy defenses. This was one of the first cases where this is bubbling to the surface. But let me answer your question. This is by far not the first time Congress has used riders to accomplish this effect. And there's many cases we cited below in the summary judgment supplement at ECF 123. We had firearms disabilities. They're just defunded. But it's become the policy of the United States. It's still only in rider form. We have various regulations. We had a number of cases that we've cited from the U.S. Supreme Court, including Fisher and Dixon, where the federal government, we have Robertson versus the Audubon Society. The federal government has used riders to accomplish these goals historically. Today, it's even worse. We have bureaucratic decisions that are safe harbors. In the SEC, we have forward-looking... There don't seem to be any marijuana cases that are enforcing agreements. Judge? I mean, I don't, I'm just, and there seem to be other federal disabilities still with getting loans or... Federal disabilities. ...or whatever. I mean, it just, if we're just looking at the kind of general policy, the vibes, as Judge Hermendorfer just said, then, I mean, you would weigh all of that stuff on the other side, wouldn't you? I would welcome and volunteer a weighing analysis of what the policy is today. The policy demonstrates it's not criminal. We have publicly traded companies dealing in this space with impunity. The Attorney General is on board. Clearly, we're not worried about punishment because they're here in court volunteering hundreds of years of sentences. And what I would say is that the federal policy was congressional and explicit. And it said, states, you decide. That is not, not a decision. That is a decision. And now, we're even past that point. And when you're past the point where you're no longer protecting the public, and you can't be because the public interest is clearly being protected under how Congress sees it today, then you're just giving somebody else's property away for free. Okay. Thank you, counsel. Just very briefly, Your Honor, I want to start with what I think is not disputed, which is that you view illegality at the time of the agreement. That time of the agreement is 2020. You look at the illegality from the perspective of the four corners of the contract. Jackson Purchase tells you that. Six years have passed since the signing of this agreement, which means a couple things. First, it means that the statute of limitations has elapsed. But it does not mean that that conduct was not illegal at the time that the parties agreed to engage in it. It also means that we were quite far from the rescheduling that Your Honor noted in your comments to counsel. That six years ago, rescheduling was not on the horizon. It doesn't make marijuana legal in any event. It just reschedules it to schedule three. But even if you thought that it affected public policy in some way, as of 2020, all you have is the CSA that made cannabis illegal and an appropriations rider that does not change the substance of the statute. The way that counsel on the other side is approaching this is almost as if Congress doesn't know the difference between legalizing marijuana and an appropriations rider. And it certainly knows the difference. There's a substantial difference between the two. And because the contract was illegal, we ask that Your Honors do not enforce it. I want to spend one moment on the alternative argument of damages. Because as counsel noted, the contract needs to be assessed, as I said, on the four corners. And counsel characterized it as the contract itself was for medical. The only reference to medical or recreational in the contract itself is the testing standards that Your Honor was noting in questions to counsel, that it was subject to recreational testing requirements. And the fair inference from that is that it was, in fact, a recreational contract. We do not think that that's dispositive to the inquiry here or to your analysis of illegality. You don't need to reach that issue to hold that this contract is illegal. But it certainly makes the case easier if you want to resolve it on that ground as well. So with that, we would ask that this court reverse. Thank you. Thank you, counsel. Thank you both for your briefing and your arguments. The case will be submitted.